# Louisville Taxicab & Transfer Company v. Boughter.

(Decided February 24, 1931.)

612

ROBERT L. PAGE for appellant.

ROBERT J. HAGAN and LORAINE MIX for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

In this action by Marcus T. Boughter against the Louisville Taxicab & Transfer Company to recover for injuries to himself and to his machine, Boughter was awarded a verdict and judgment for $3,500. The defendant appeals.

The first ground urged for reversal is that the verdict is flagrantly against the evidence.

The accident occurred in Louisville at the southern intersection of Broadway and First street. According to Boughter, who operated an elevator at the Brown Hotel, he and two friends, Frank Newman and Marvin Braun, after attending a theater, had gone to a family party at the home of his aunt, who resided in the western part of the city. About 12:30 a. m. he left the home of his aunt for the purpose of taking his friends to their respective homes. Boughter was driving a Nash coupe, and, after reaching Broadway at Third street, proceeded east on the south side of Broadway towards First street. It was then about 1 o'clock. Near First street some excavation was being done between the car stop and the south curbing. He was driving between the excavation and the curbing, and was running about 15 miles an hour. The light was green, and, as he was about to enter the intersection, he saw the taxicab on the south tracks of the street car company approaching from the west, and angling slightly toward the corner. After he had gotten almost over the southeast curbing of First street, the driver of the taxicab, without indicating his purpose by extending his hand or blowing his horn, turned suddenly to the left and ran into his car, striking it at the front hub cap. All the damage was on the left-hand side, and extended back to the tail light. The bumper on the right-hand side was perfectly straight. The door was torn off, and his car was tipped to one side.

Newman testified that Boughter was driving about 15 or 16 miles an hour. When they came to First street they saw the cab standing there waiting for the light to

change. Boughter stopped and put his machine in second. The cab made a quick turn and hit Boughter's car between the left front wheel and the front door. No part of Boughter's car came in contact with the rear of the cab. When the cab made the turn, Boughter's car was almost across the intersection. Shortly after the accident he saw the cab, at the Brown Hotel, and the right bumper and fender were bent. At the same time he heard one of the boys from the taxi company say, "Take it easy because the front end is damaged."

Sherman Oliver, who had been employed by appellant, and had been laid off, testified that he had just discharged a passenger on Chestnut street, east of First street. He then turned around and came back south on First street to Broadway. He stopped on the northwest corner of First and Broadway for a red light, and lit a cigar. He noticed a car coming east on Broadway, and also saw a cab coming west on Broadway in the south car track. When the cab was within four or five feet of the east side of the intersection, it began to turn south on First street, and cut the southeast corner about three feet from the corner. When he first saw the cab it was going around thirty miles an hour, but checked up when it was going to make the turn. The driver of the cab did not blow his horn or give any indication of his intention to turn to the left. Afterwards he went to the place of accident but paid very little attention to the coupe. He only looked at it, and did not notice any damage or injury to it except on the left-hand side as indicated in the picture that was handed to him. He never paid any attention to the condition of the taxicab, but the front end of the cab was directly against the other car. At that time there was little or no traffic on the street.

On being shown a photograph of the Nash coupe, G. W. Munz, to whose garage the cab was taken, testified that the picture handed to him represented the nature of the damages done to the car.

Marvin Braun, the other occupant of the Nash coupe, stated that they were going at a moderate rate of speed. They had almost passed over First street when he saw the lights coming right into them and then the accident happened. As they started across First street the light was green. When he first saw the taxicab it was right on top of them. All that he saw was some lights flare into their eyes and cut right into the side of their car. Their car was struck right in back of the front

wheel on the left-hand side. After he became conscious he noticed Boughter's car was headed into the curb on a slant, and the front part of the taxicab was headed right into the back wheel. Braun admitted that he told a police officer that he was not in the accident, but did this because he was frightened, shaken up, and afraid of arrest.

On the other hand, C. H. Goodman, the driver of the taxicab, testified, in substance, as follows: He had picked up Gen. Frank E. Daugherty as a passenger, and was en route toward either Jacob or College street, and was going west on Broadway. When he reached First street, the green light was with him. There was a taxicab in his rear, and Boughter's machine was below Second street. He could see in the windshield the lights from the rear car through the back glass in the sedan. He threw out his left hand for the benefit of the driver of that car, and not for Boughter. He had made the corner and was fully leveled out south on First street when Boughter swung between the safety zone, hit the water there, collided with him, and struck the cab at the back door. The only damage to the cab was the back door glass, the caved in back door, and where Boughter's left front wheel had gone half way up on the front fender. The impact knocked the cab to within two or three feet of the curb on the southeast corner. As he came down Broadway from Brook to First street he was making about twenty miles an hour. The reason he stopped at First street was he wanted to give the machine behind him ample signal before he made the left turn. As he pulled up to First street, Boughter's car had not crossed Second street. While he was going twenty-five or thirty feet, Boughter came all the way from Second street. After seeing Boughter on Second street, he never paid any more attention to Boughter. He was making a turn and could only look one way. He had no picture of his automobile, but it could be plainly seen. The front bumper of his car was up against the left-hand side of the Boughter car after the accident.

J. E. Dame, who had stopped at the corner of Second and Broadway because the light was against him, testified that he saw the Nash car going up the street like a streak of lightning. He imagined he was going at the rate of about 50 miles an hour, and did not slow down at all until he hit the other machine.

Robert Williams testified that he was near First and Broadway, coming from his supper. The Nash car was

going around forty miles an hour, and the front end of the Nash car hit the rear end of the taxicab. He saw the cars before they were moved, and the front part of the taxicab was against the left-hand side of the coupe. The cars were near the southeast corner of First street. The rear fender of the taxicab was bent. He also noticed a dent in the bumper in the front.

Robert Lee Keller, a former employee of the Yellow Cab Company, testified that he was deadheading down Broadway from a trip in the Highlands, and was being followed by a Yellow cab driven by Goodman. Goodman passed him, and, when he reached First street, he saw Goodman put his hand out the window to signal that he was going to turn south on First street. He slowed up to give Goodman the right of way. As Goodman turned in he followed on behind him, going slowly. He saw the Nash coupe coming up the street at the rate of forty-five or fifty miles an hour. From the way it struck, he considered that the Nash struck the back door of the right front fender near the door of the cab. Goodman did not come to an absolute stop at First street, but slowed down. Gen. Frank E. Daugherty testified that he was the only passenger in the taxicab, and was sitting on the back seat. He was not much of a judge of speed, but would say that they were going at a moderate rate of speed. The next thing he knew they were smashed into, and he was thrown toward the front and received several injuries. He could not say what part of the taxicab was struck. He did not notice anything unusual in the movement of the taxicab. He had never operated an automobile. On cross-examination he stated that he was not paying much attention to the situation. He just got in the taxi and expected to be delivered safely. His eyes were not closed, but he was sitting there smoking his pipe. He did not know what part of the cab was struck by the car. When struck, he was pretty badly dazed, and could not see out of either eye for the blood.

J. E. Grawemeyer testified that he was walking along in front of Abraham's drug store at First and Broadway. He heard a noise coming up Broadway and turned around and saw the Nash coupe. It was then going about thirty-five or forty miles an hour, and did not slow down for the intersection. It looked to him like the left front of the Nash struck the rear right door of the taxicab. He did not see any automobile behind the taxicab coming west on Broadway.

Albert Coons testified that he was with Mr. Grawemeyer. The taxicab was making a left-hand turn on Broadway out First street. The first thing he knew the Nash car ran into the taxicab. In his opinion the Nash car was going about forty miles an hour. The streets were slippery, and he did not know whether the driver of the Nash car tried to slow down or not. He believed the right back end of the taxicab was struck by the Nash. He believed the left side of the Nash car hit the taxicab.

Police Officer, H. L. Raymer was at First and Broadway. The accident happened just as he came by. The first thing he did was to stop and jump out of the machine and see what he could do. There was a lot of ice on the street, and there were skid marks up to the place where the coupe was sitting. The skid marks were sideways. The Royal Blue had some sideway marks. It appeared that the left front wheel of the Nash struck just in front of the right rear wheel on the Royal Blue. On cross-examination he stated that the whole side of the coupe was torn out. The left front wheel of the coupe was knocked clear back under the driver's seat. All the damage to the coupe was on the left-hand side. He could not tell when Oliver got there. He only saw him when he pulled up after the accident, and told him to get out of the way and not block the traffic.

C. B. Allen, another police officer who went to First and Broadway at the time of the accident, testified that the wheels of the cab when they were pushed over left a black line all the way across the street. The front wheel of the Nash was on the fender of the Royal Blue. The two machines were pretty close to the southeast corner. The Royal Blue was facing out First street a little bit, and the left wheel of the Nash was on the fender of the Royal Blue.

R. E. Lloid, who was also connected with the police department, testified that the cab had been hit at the right rear fender, and the left front side of the Nash was completely demolished. He saw skid marks on Broadway for possibly forty feet. It looked as if the brake had been put on the Nash for a period of sixty feet and had not stopped the car.

C. D. Moratt, appellant's assistant general manager, testified that the right rear fender, running board, and the right rear door on the taxicab were injured. He did not think they took a picture of the taxicab.

D. E. Clark, one of appellant's drivers, testified that he examined the taxicab, and it had been struck about the side door.

It will be seen from the foregoing resume of the evidence that the evidence of appellee and his witnesses was to the effect that appellee was going at a moderate rate of speed, and, as he crossed the intersection, the taxicab turned suddenly to the left, cut the corner, and collided with appellee's car. On the other hand, appellant's driver and the other witnesses testified that, after the taxicab made the turn, appellee's car, which was going at a high rate of speed, ran into the taxicab. In view of the fact that, in addition to other duties, it was the duty of the driver of the taxicab before turning or changing his course to see first that there was sufficient space for such turn to be made in safety, and, if it appeared that the movement or operation of Boughter's car might reasonably be affected by such turn, to indicate by proper signal his intention to turn, and his further duty to use ordinary care to avoid coming in collision with Boughter's car, and that, in addition to other duties, it was the duty of Boughter to use ordinary care to avoid colliding with the taxicab, it is at once apparent that the case does not turn altogether on which vehicle ran into the other, but on whose negligence caused the collision. On this question there was such sharp conflict in the evidence that the questions of negligence and contributory negligence were peculiarly for the jury, and we are unable to say that its finding is flagrantly against the evidence.

Another contention is that the court failed to give a right of way instruction. The offered instruction reads: "The court further instructs you that if Goodman, driving the taxicab reached the intersection of First street before Boughter reached the intersection and that Goodman intended to turn south on First Street and gave the signal of his intention to so do, then it was the duty of Boughter to yield the right of way to the taxicab."

Whether, under other circumstances, it would have been proper to give a right of way instruction, and whether its refusal would be regarded as prejudicial error, we need not determine. There was no evidence that Goodman gave Boughter any signal of his intention to turn. On the contrary, he stated that he gave the signal for the benefit of the driver of the machine in his

618

rear, and gave no signal to Boughter. There being no evidence authorizing the giving of the offered instruction, and it further appearing that the relative duties of the operators of the two cars were so fully set forth in the given instructions that the jury could not have misunderstood the questions submitted, we conclude that the trial court did not err to appellant's prejudice in refusing the offered instruction, or in failing to give another instruction on the question of right of way.

Judgment affirmed.